582 F.Supp. 1552 (1984)
NORFOLK AND WESTERN RAILWAY COMPANY, Plaintiff,
v.
PUBLIC UTILITIES COMMISSION OF OHIO, et al., Defendants,
and
The Co-Operative Legislative Committee, Railroad Brotherhoods and Railroad Unions, State of Ohio, Intervenor.
Civ. A. No. 83-2.
Special Court, Regional Rail Reorganization Act.
March 29, 1984.
Certiorari Denied May 21, 1984.
*1553 Jeffrey S. Berlin, Michael J. Wilhelm, Verner, Liipfert, Bernhard & McPherson, Chartered, Washington, D.C. (Mark D. Perreault, Norfolk and Western Ry. Co., Roanoke, Va., of counsel), for plaintiff Norfolk and Western Ry. Co.
Martin J. Marz, Asst. Atty. Gen., Public Utilities Section, Columbus, Ohio (Anthony J. Celebreeze, Jr., Atty. Gen. of Ohio, Robert S. Tongren, Asst. Atty. Gen., Section Chief, Public Utilities Section, Columbus, Ohio, of counsel), for defendants Public Utilities Com'n of Ohio, et al.
Mark Adams, C. Richard Grieser, Grieser, Schafer, Blummenstiel & Slane Company, L.P.A., Columbus, Ohio, for defendant-intervenor Co-Op. Legislative Committee, Railroad Brotherhoods and Railroad Union, State of Ohio.
Before GASCH, Presiding Judge, and BRYANT and WEINER, Judges.
Certiorari Denied May 21, 1984. See 104 S.Ct. 2400.

MEMORANDUM OPINION
BRYANT, Judge.
This action is before the court on plaintiff Norfolk and Western Railway Company's ("N & W") motion for summary judgment on the grounds of federal preemption. The principle issue in this case is whether § 4999.20 of the Ohio Revised Code ("Section 4999.20") is preempted by § 711 of the Regional Rail Reorganization Act of 1973 ("3R Act"), as amended by the Northeast Rail Service Act of 1981 ("NRSA"), 45 U.S.C. § 797j ("Section 711").
N & W contends that § 4999.20 is a state full crew law of the type preempted by § 711, that § 711 applies to N & W's operations in Ohio and that this court has original and exclusive jurisdiction over the interpretation of § 711 pursuant to Section 1152(a) of NRSA, 45 U.S.C. § 1105(a). In its complaint, N & W seeks both an injunction restraining defendants Public Utilities Commission of Ohio, its Chairman and a Commissioner ("PUCO") from enforcing § 4999.20 against N & W and a declaration that § 711 preempts the enforcement of § 4999.20 against N & W. PUCO, on the other hand, argues that interpretation of § 4999.20 is a question of state law and that until it determines that § 4999.20 is applicable to N & W, the issue is not ripe for summary judgment. In addition, PUCO maintains that Congress intended that § 711 preempt state full crew laws only with regard to Conrail. Intervenor, the Co-Operative Legislative Committee, Railroad Brotherhoods and Railroad Unions, State of Ohio ("Co-Op"), maintains that § 4999.20 is not the type of statute that § 711 preempts but to the extent that § 711 does preempt § 4999.20, it is a violation of the fifth amendment. For the reasons stated below, the plaintiff's motion for summary judgment is granted.

Background
N & W brought this action in response to commencement of formal proceedings by PUCO to enforce § 4999.20 against N & W. The PUCO proceedings began as a result of letters of complaint directed to PUCO by Co-Op on October 27, 1982 and by the Brotherhood of Railroad Engineers, Ohio Legislative Board ("BLE") on October 30, 1982.[1] The substance of those complaints was that N & W violated § 4999.20 on two occasions by operating trains without a fireman when firemen with seniority dates adequate to invoke the protection of § 4999.20 were available for employment. Section 4999.20, the successor to Ohio's full crew law, provides:
No railroad employee who has a seniority roster date on the effective date of the repeal of Sections 4999.07 and 4999.08 of *1554 the Revised Code shall be removed from his employment or have his seniority rights or vacation or other fringe benefits reduced by reason of such repeal. Any carrier which violates this Section shall be fined not less than $100 nor more than $5,000.00. The Public Utilities Commission shall enforce this Section and prosecute any violations thereof. [Ohio Rev.Code § 4999.20.]
Pursuant to its rules,[2] PUCO investigated the complaints and subsequently held an informal conference among the parties on January 13, 1983 in an attempt to settle the dispute. The parties were "unable to reach agreement" on the complainants' claims that the firemen were entitled to employment on the N & W trains in question.[3]
On January 26, 1983, PUCO issued orders commencing formal proceedings against N & W and ordering N & W to answer the Co-Op and BLE complaints within 15 days.[4] In response to a request for an extension of time by N & W, the time within which to answer was extended until February 25, 1983.[5] N & W filed its complaint in this court on February 25, 1983 and at the same time, filed with PUCO a motion to stay the PUCO proceedings. On March 22, 1983, PUCO filed a motion to dismiss contending that this court did not have jurisdiction over the matter and was without power to enjoin proceedings before PUCO. The court denied PUCO's motion to dismiss on May 25, 1983, finding that PUCO's particular contention with regard to this court's jurisdiction was "plainly wrong." The court did not address the issue of its power to enjoin the PUCO proceedings at that time and the PUCO proceedings continued.
There was no further action in the PUCO proceedings until October 5, 1983, when PUCO denied N & W's motion to stay and ordered the parties to submit briefs addressing the issue of whether PUCO had jurisdiction to proceed in the case. In addition, the parties were directed to discuss "... assuming arguendo that the Commission lacks jurisdiction to proceed in this case, whether Section 4999.20, Ohio Revised Code is compatible with pertinent provisions of the 3-R Act and NERSA or whether Section 4999.20 is fatally inconsistent."[6] At the request of the intervenor Co-Op, the date for filing of the briefs before PUCO was extended until January 7, 1984. On November 2, 1983, N & W moved for summary judgment in this court and on December 7, 1983, N & W filed a motion for a preliminary injunction. In response to N & W's motion for a preliminary injunction, this court issued an order on December 22, 1983 in which we stayed the proceedings before PUCO pursuant to § 209(g) of the 3R Act, 45 U.S.C. § 719(g), to preserve this court's original and exclusive jurisdiction to interpret any provision of NRSA pursuant to § 1152(a) of NRSA.
This case involves the interpretation of § 711 which is titled "Preemption" and provides:
No State may adopt or continue in force any law, rule, regulation, order, or standard requiring the Corporation, the National Railroad Passenger Corporation, or the Amtrak Commuter Services Corporation to employ any specified number of persons to perform any particular task, function, or operation, or requiring the Corporation to pay protective benefits to employees, and no State in the Region may adopt or continue in force any such law, rule, regulation, order, *1555 or standard with respect to any railroad in the Region. [45 U.S.C. § 797j.]

Discussion
As a preliminary matter, PUCO argues that this case is not ripe for summary judgment because the issue of whether § 4999.20 can be interpreted in a manner consistent with § 711 is one of state law which must be decided by PUCO pursuant to its statutory duties.[7] PUCO maintains that there is no issue upon which this court may reach a decision, until PUCO has determined that § 4999.20 is not preempted by § 711 and is applicable to N & W. In support of its argument, PUCO cites to a number of cases involving the doctrine of ripeness as applied to review of administrative agency decisions; these cases are inapposite.
PUCO's ripeness argument overlooks both the nature of this proceeding as well as the express language of NRSA. Section 1152(a) of NRSA provides that: "Notwithstanding any other provision of law, the special court shall have original and exclusive jurisdiction over any civil action for injunctive, declaratory, or other relief relating to the enforcement, operation, execution or interpretation of any provision of or amendment ..." of NRSA. (Emphasis added). In this case, the court is not asked to review PUCO's interpretation of a state statute or its enforcement decision pursuant to state law. On the contrary, as this court recognized in its order of May 25, 1983 denying PUCO's motion to dismiss and in its order of December 22, 1983 staying the PUCO proceedings until further order of this court, this action involves the interpretation of § 711 and is clearly within this court's original and exclusive jurisdiction pursuant to § 1152(a) of NRSA.
Having determined that this court has jurisdiction to decide this case, we now turn to the pivotal issue  whether § 711 preempts § 4999.20. As a threshold matter, we must determine whether § 4999.20 is a full crew statute of the kind preempted by § 711. N & W maintains § 4999.20 is such a statute and PUCO does not seem to dispute this conclusion. Intervenor Co-Op, however, admits that § 4999.20 is the successor statute to Ohio's full crew law but argues that it simply maintains the employees' seniority rights and vacation and other fringe benefits rather than specifying any particular number of persons to perform any specific tasks as prohibited by § 711.
Co-Op's argument is without merit. Section 4999.20 provides that no employee who has a seniority roster date on the date of the repeal of Ohio's full crew laws[8] "shall be removed from his employment or have his seniority rights or vacation or other fringe benefits reduced by reason of such repeal." (Emphasis added). Section 711 prohibits states from continuing in force any law regarding employment of "any specified number of persons to perform any particular task, function, or operation" or which requires payment of "protective benefits to employees." The House Committee Report on a predecessor bill with a provision substantially similar to § 711 states that "[t]he Committee specifically intends to preempt any state full crew laws which require crews to contain certain numbers or certain positions, and any state laws which phase out such requirements." Rail Service Improvement Act of 1981: House Comm. on Energy and Commerce, H.R.Rep. No. 97-153, 97th Cong., 1st Sess. 30 (1981) (emphasis added). The fact that § 4999.20 makes it unlawful for a railroad to remove employees with certain seniority rights from their jobs as well as the fact that it is the successor statute to Ohio's full crew laws makes clear that § 4999.20 is a state law intended to "phase out" the requirements of a state full crew law. As such, § 4999.20 is the type of statute that Congress specifically intended § 711 to preempt.
*1556 PUCO argues that, notwithstanding this conclusion, § 711 was enacted to apply solely to Conrail and that Congress' intent was not to preempt state statutes such as § 4999.20 as applied to "profitable railroads." In arguing that § 711 applies to all railroads, N & W relies on the plain language of § 711. The dispute regarding whether § 711 applies to railroads other than Conrail arises from the last clause of § 711. While the first part of § 711 relieves Conrail of the burden of state full crew laws, the final clause duplicates the relief "with respect to any railroad in the Region." (Emphasis added).
The starting point for determining whether a federal statute preempts a state law is to "ascertain Congress' intent in enacting the federal statute at issue." Shaw v. Delta Airlines, Inc., ___ U.S. ___, 103 S.Ct. 2890, 2899, 77 L.Ed.2d 490 (1983). It is a fundamental rule of statutory construction that one is to look first at the language of the statute. Dickerson v. New Banner Institute, Inc., ___ U.S. ___, 103 S.Ct. 986, 990, 74 L.Ed.2d 845 (1983) (citing authorities).
In this case, it is hardly necessary to do more. The language of § 711 is unequivocal. It expressly extends the prohibition against state enforcement of full crew laws to "any railroad in the Region." The term "Region" includes the State of Ohio,[9] and the term "railroad" clearly applies to N & W.[10] Moreover, because the first part of § 711 specifically mentions Conrail, the last clause would be superfluous if Congress did not intend that § 711 apply to railroads other than Conrail.
Ordinarily where, as here, the language of a statute is unambiguous, "it is to be regarded as conclusive unless there is `a clearly expressed legislative intent to the contrary.'" Dickerson, 103 S.Ct. at 990, quoting Consumer Product Safety Commission v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). PUCO asks this court to disregard the plain language of § 711 because, PUCO argues, including profitable railroads within the reach of § 711 is inconsistent with the stated purpose of the 3R Act and NRSA, which was to make Conrail economically viable. PUCO argues that by applying § 711 to all railroads, costs would be reduced throughout the industry, thus preventing Conrail from achieving a profitable rail system.
The application of § 711 to § 4999.20 with respect to N & W, as clearly mandated by the language of § 711 is not contrary to the purpose of the 3R Act and NRSA. The legislative goal was to give Conrail the opportunity to become profitable, but not necessarily to disadvantage all other railroads at the same time. In fact, Congress has clearly stated that "[a] balanced and competitive transportation system is essential to the entire country" and that activities associated with the railroad reorganization should "not harm the delicate competitive balance of the transportation system of the country." H.R.Rep. No. 97-153, 97th Cong., 1st Sess. 9 (1981).
We have not found nor have we been directed to any legislative history specifically addressing why the last clause of § 711 was added. This absence of legislative history shows no more than, perhaps, that the last clause was added at the eleventh hour. This court is not at liberty to create legislative history where none exists nor to ignore the express language of a statute merely because of a lack of legislative *1557 history. What NRSA's legislative history does reflect, however, is Congress' recognition of the problem of overmanning ("particularly in the continued use of fireman [sic]") and of the need for changes in "technologically obsolete" crew consist requirements.[11] Moreover, this court as well as the Supreme Court, has recounted the history of the persistent effort on the part of the nation's railroads to cut back on unnecessary crew members, including firemen and brakemen.[12]
The Supreme Court has noted that "[p]reemption may be either express or implied, and `is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" Shaw, 103 S.Ct. at 2899, quoting Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). In this case, Congress' intent to preempt is explicitly stated in § 711 and this court "must give effect to this plain language unless there is good reason to believe Congress intended the language to have some more restrictive meaning." Id. 103 S.Ct. at 2901 (citing authorities). Based upon the foregoing, we perceive no indication that Congress intended that § 711 be given a more restrictive reading than that which we give it in this case. Thus, by holding that § 711 preempts § 4999.20 with respect to N & W, we merely give effect to the unambiguous language of § 711.
Intervenor Co-Op challenges the constitutionality of the last clause of § 711 as violative of both the due process and equal protection components of the fifth amendment.[13] It is important to note at the outset that Congress has authority under the Commerce Clause to "allocate the interlocking economic rights and duties of employers and employees." Cannon, 535 F.Supp. at 709 (citing authority).
Co-Op maintains that § 711 violates due process because relieving railroads other than Conrail of the economic burden of state labor protection requirements is not rationally related to the sole objective of the 3R Act and NRSA which was to give Conrail economic advantages. Co-Op errs, however, in assuming that Congress had only one goal when it enacted the 3R Act and NRSA. On the contrary, one of the stated purposes of this legislation was the preservation of "essential rail service" in the Northeast and Midwest regions. 45 U.S.C. § 701. Section 711 is rationally related to that purpose because it promotes the economic well-being of all railroads in the relevant area. Thus, we cannot conclude that when Congress enacted § 711, it "acted in an arbitrary and irrational way." Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976).
Co-Op also argues that § 711 violates equal protection because N & W employees working in the Region are denied the protection of state full crew laws by virtue of § 711 while their counterparts working in states outside of the Region may invoke the benefits of any full crew law their states choose to enact. This court has recognized that "[a]pplication of the equal protection concept to invalidate economic regulation is quite restricted." Cannon, 535 F.Supp. at 708. Where, as here, the alleged classification affects no fundamental rights and works no invidious discrimination, the sole duty of a court is to *1558 determine that the statute which creates the classification is a "rational way to correct" a perceived problem. Id. As we discuss above, § 711 is indeed a rational way to deal with the problem of maintaining essential rail service in the Region. Accordingly, Co-Op's equal protection challenge must also fail.

Conclusion
"It is well established that within Constitutional limits Congress may preempt state authority by so stating in express terms." Pacific Gas and Electric Co. v. State Energy Resources Conservation & Development, ___ U.S. ___, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983). This is precisely what Congress did when it enacted § 711; plaintiff is entitled to summary judgment. While a declaration that § 711 preempts enforcement of § 4999.20 against N & W is appropriate, the court does not believe it is necessary at this time to issue an injunction in order to enforce its mandate and dissolves its stay entered December 22, 1983.
NOTES
[1] Affidavit of Mark D. Perreault, October 31, 1983 ("Perreault Affidavit") at ¶ 3 and Attachments 1 and 2.
[2] Under Chapter 4907 of the Ohio Revised Code, PUCO is charged with the responsibility of regulating intrastate railroads and of inquiring "into any neglect or violation of the laws of this state by a railroad doing business in this state". See Ohio Rev.Code § 4907.08. After conducting an investigation, PUCO must hold a conference in an attempt to informally resolve the dispute. Rule 4901-5-20(A)(1) of the Code of Rules and Regulations of the Public Utilities Commission of Ohio.
[3] Perreault Affidavit at ¶ 6 and Attachments 7 and 8.
[4] Attachments 9 and 10 to Perreault Affidavit.
[5] Attachment 11 to Perreault Affidavit.
[6] Attachment 13 to Perreault Affidavit.
[7] See note 2, supra.
[8] Ohio's full crew laws required a minimum crew of five on freight trains and switch engines. 1919 Ohio Laws Vol. 108, Part I. In 1972, these laws were repealed and replaced with § 4999.20.
[9] "Region," as defined by § 102(17) of the 3R Act, "means States of Maine, New Hampshire, Vermont, Massachusetts, Connecticut, Rhode Island, New York, New Jersey, Pennsylvania, Delaware, Maryland, Virginia, West Virginia, Ohio, Indiana, Michigan, and Illinois; the District of Columbia; and those portions of contiguous States in which are located rail properties owned or operated by railroads doing business primarily in the aforementioned jurisdictions (as determined by the Commission by order)." 45 U.S.C. § 702(17).
[10] "Railroad" is defined by § 102(15) of the 3R Act as "a common carrier by railroad as defined in section 1(3) of part I of the Interstate Commerce Act (49 U.S.C. 1(3)). The term includes the Corporation and the National Railroad Passenger Corporation." 45 U.S.C. § 702(15). N & W is a common carrier by railroad as defined in 49 U.S.C. § 10102, the successor statute to 49 U.S.C. § 1(3). PUCO incorrectly reads § 102(15) as including only the Corporation and the National Railroad Passenger Corporation; its reading is underinclusive.
[11] Northeast Rail Service Act of 1981: Hearings on S. 1100 Before the Subcomm. on Surface Transportation of the Senate Comm. on Commerce, Science, and Transportation, 97th Cong., 1st Sess. 81-82 (1981). Congress' concern was that until railroads were relieved of requirements specifying the minimum number and type of personnel that must be on board every train, operating costs would continue to increase and productivity would be impeded. Id.
[12] See United Transportation Union v. Consolidated Rail Corp. ("Cannon"), 535 F.Supp. 697, 710 (Regional Rail Reorg. Ct.1982), cert. denied, 457 U.S. 1133, 102 S.Ct. 960, 73 L.Ed.2d 1350 (1982), citing Chicago & N.W. R. Co. v. United Transportation Union, 402 U.S. 570, 573, 91 S.Ct. 1731, 1733, 29 L.Ed.2d 187 (1971) (citing authorities).
[13] It appears that Co-Op has abandoned its claim, as alleged in its answer, that § 711 is unconstitutional as against the tenth amendment.